## Case No. 18,181.

## The YOUNG MECHANIC.

### [1 Ware, 535.] 1

District Court, D. Maine. April 17, 1854. 2

LIBEL AGAINST VESSEL — LIEN FOR MATERIALS — DEATH AND INSOLVENCY OF OWNER—EFFECT.

1. The privileged lien against a vessel given to material men by the Revised Statutes of Maine (chapter 125, § 35) amounts essentially to an hypothecation of the vessel to the privileged creditor.

[Cited in The Richard Busteed, Case No. 11,-764.]

2. An hypothecary creditor has the same jus in re, or proprietary interest in the thing, as a pawnee or mortgagee.

3. His rights are paramount to the rights of the general creditors under the laws of the state regulating the distribution of estates of deceased insolvent debtors.

4. The case of Severance v. Hammatt, 28 Me. 522, was decided against a lien creditor on the death and insolvency of the debtor, on the ground that the laws provided no means by which the lien could be enforced in such a case, consistently with the rights of the general creditors under the laws for the distribution of insolvent estates. But as no such difficulty exists in the admiralty, that court can give the creditor his appropriate remedy.

Mr. Evans, for libellant.
Mr. Shepley, for respondent.

WARE, District Judge. This is a libel in rem against the hull of a new ship, since named the Young Mechanic, built the last season at Rockland, in this state, by a material man for the price of materials furnished by the libellant for building it. The libel is founded on the statute of the state giving to this description of creditors a lien on the ship, as a security for the price of the materials furnished. Wm. McLoon, the claimant, in his answer alleges that on or about the 8th of April, 1854, one Francis Rhoades, intending to build a ship during the season, applied to him for a loan of money to purchase the materials and pay the laborers; that he advanced for that purpose the sum of $20,000; that on the 8th of May, Rhoades executed and delivered to him a mortgage of the materials for the sum advanced; and that having required further advances, he, on the 8th of November, executed another mortgage of the vessel for the further sum of $20,000 advanced; that, afterwards the respondent made further ad-

vances to the amount of about $25,000, and on the 4th of December, Rhoades made an absolute conveyance of the vessel to him, and on the eighth of that month died insolvent; that the estate was duly represented insolvent by the administratrix, and commissioners of insolvency have been duly appointed.

The answer proceeds to state, by way of defence, that the whole advances to the amount of $65,000 were made on the credit of the ship. It is admitted that the articles mentioned in the schedule annexed to the libel were furnished by the libellant at the request of Rhoades, the builder on account, and on the credit of the ship; but it is contended that if the libellant ever had a lien on the ship, it has been dissolved by the death and insolvency of Rhoades.

The respondent having admitted in his answer that the materials mentioned in the libel were furnished for and on account of the vessel, the case presents but a single question for decision; that is, whether, admitting that the libellant ever had a lien, it has been subsequently dissolved by the death and insolvency of the person who was owner at the time when the materials were furnished, and who remained so until the transfer, on the 4th of December. It appears to me very clear, under this law, that a creditor who has advanced money on a mortgage of the materials, or the ship, is in no better condition to defend against the liens of material men, than the owner or mortgagor; that he merely succeeds to the place of the owner, the evident object of the law being to give to material men and laborers a lien on the vessel for their security, whoever may be the owner, paramount to all other claims.

It is certainly true that there is the same apparent equity in allowing a privilege to a creditor, who loans money to be applied to the building of a ship, if in fact it is so applied, as in allowing it to the furnisher of materials and the mechanics, by whose materials and labor the ship is made, and the Roman law allows the privilege to both concurrently. For the thing thus created by his money, in the pointed language of Domat, is as it were his, to the amount that his money has contributed to make it, "elle est comme sienne jusqu' à la concurrence de ce qu'il y a mis," in the same sense and to the same extent as it is the material man's or the mechanic's. Domat, Lois Civiles, liv. 3, tit. 1, § 5, Nos. 4, 6, 9–11. But the common law gives to the lender no such privilege, and the legislature has not seen fit in amendment of the law to extend the privilege to him, which it has given to the laborer and furnisher of materials. The 35th section of the Revised Statutes of Maine, under which the lien is claimed, is in these words: "Any ship-carpenter, caulker, blacksmith, joiner, or other person, who shall furnish labor or materials for or on account of any vessel, building or standing on the stocks, or under repairs aft-

---

1 [Reported by Hon. Ashur Ware, District Judge.]

2 [Affirmed in Case No. 18,180.]

er having been launched, shall have a lien on such vessel for his wages and materials until four days after such vessel is launched, or such repairs afterwards have been completed; and may secure the same by an attachment on said vessel within that period, which shall have precedence over all other attachments."

The question whether the lien is dissolved by the death and insolvency of the owner, must depend on the nature and quality of the lien or privilege, and the right and interest in the thing which it assures to the favored creditor. If it is secured by an attachment or arrest of the vessel, within the time limited, it has a precedence over all other attachments, that is, attachments of any other creditors of the owner. The law thus constituting it a privileged lien, it amounts to a legal hypothecation of the ship, like a bottomry bond, or the lien of seamen for their wages. The ship itself becomes in some sense a debtor. It is a jus in re, a proprietary interest in the thing, which may be enforced directly against the thing itself by a libel in rem, in whose ever possession it may be and to whomsoever the general title may be transferred. It is not indeed a full jus proprietatis in every sense, but one of a qualified nature. It does not constitute the lien creditor a tenant in common with the general owner to all purposes, so that if the possession comes into his hands he can hold it as a tenant in common and employ it in that right; but it gives him an interest in the thing, and a right by judicial process to get his pay from it. And this proprietary interest is as complete, as it is in case of pawn or mortgage. In this respect there is no difference between pawn and hypothecation; and such is the decision of the Roman law. "Inter pignus et hypothecam tantum nominis differt." Dig. 20, 1, 5, 51; Just. Inst. 4, 6, 7; Domat, liv. 3, tit. 1, § 1, note. The difference between them consists only in the remedy. The pawnee having the possession of the thing, may, in some cases at least, sell it and pay himself; but the hypothecary creditor, not having the possession, must obtain a judicial order before the thing is sold.

If this view of the subject is correct, it seems to follow on general principles, that in the event of the owner's death and insolvency, the legal interest of the hypothecary creditor remains unaffected by the fact of insolvency and death, precisely as it would in a case of mortgage, the hypothecation being the precise equivalent to a mortgage containing a stipulation that the mortgagor shall retain the possession until the condition is broken. It being a transfer of a legal interest in the thing, jus in re, to the hypothecary creditor under a condition, after that is broken he has a right to hold the thing against all other persons, who derive title under the hypothecators, in whatever manner their title is derived, whether from contract, or whether it is cast upon them by operation of law.

But it is said that the supreme court of the state has given a different construction to the 37th section of the same chapter of the Revised Statutes, which gives to material men a similar lien on houses. The language of the two sections, though not perfectly identical, is so nearly alike in the operative words, that there does not appear to be any satisfactory ground for making a distinction in the construction of the two, both being in pari materia, and both apparently having the same general object, the benefit of material men and mechanics. And as the courts of the United States hold themselves bound, in carrying into execution state laws, by the construction given to them by the state tribunals, I might have felt myself bound to follow this decision, if it presented itself to my mind precisely in the same light as it seems to have done to the counsel for the respondent. But in examining the opinions, though it appears that the court intimated, and perhaps pretty strongly, their doubts, whether the lien in that case was not intended by the legislature to be subordinate to the general laws of the state for the distribution of the estates of deceased insolvent debtors, yet I think it is pretty apparent that the decisive, and turning point, in the decision, was the want of power in the court to carry the provisions of the law into effect under any other construction. "It might at least," say the court, "be regarded as doubtful whether such was the intention of the legislature;" (that is, to make that lien paramount to the claims of other creditors, and all other claims, in case the debtor died insolvent,) "and if such an intention could be discerned, no provision is made to carry the intention into effect. In such a case the court would not be authorized to supply the enactments necessary to enable one to maintain an action and to recover a judgment only against the estate subject to the lien." Severance v. Hammatt, 28 Me. 522. Now, if this case had been under the 35th section, and the suit had been in the admiralty, this objection, which was fatal in a court of common law, would not have existed. For the law, having in its effect and operation made the thing itself a principal debtor, the admiralty proceeds directly against it, as a party, by a libel in rem, and the decree is executed upon it without touching the general assets of the estate. And if the law gives to the lien creditor this preference, he ought not to be deprived of it merely because one tribunal cannot consistently with the law, which governs the action of that court, give the remedy, provided another court, to which he is authorized to apply, can give it. And this result is no novelty, but is familiar to the jurisprudence of the state. When a party has rights, which are guaranteed by the general law of the state, and a court of common law cannot,

consistently with its own peculiar jurisprudence and its forms and modes of proceeding, give a remedy, he is turned over to a court of equity. And further; the act of 1850, passed immediately after the publication of this decision of the court, was evidently intended to remedy the imperfection of that section of the Revised Statutes, which the decision disclosed. And though this act does not in its terms extend to the 35th section, it is so clear a declaration of the legislative intention in respect to the 37th section, and the 35th being in pari materia, and the credit being precisely similar in its character with the other, that in reason and equity it ought to be held to be a declaration of the legislative intention in relation to this section as well as the other. Decree for the libellants.

[NOTE. The decree of the district court was affirmed on appeal to the circuit court. Case No. 18,180. The libels were afterwards referred to a commissioner to ascertain the amount of each claim, and, upon his report being confirmed by the court, the parties were heard on the taxation of costs. Case No. 18,182.]